SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Ebenezer Byrd (A-3/4/5-24) (089469)**

**Argued February 3, 2025 -- Decided July 24, 2025**

**NORIEGA, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a trial judge took appropriate steps in response to serious mid-trial allegations of juror misconduct. The claims included that the juror conducted outside research, discussed the case with third parties, texted one of the defendants, and expressed an intent to find the defendants guilty.

The State charged defendants Ebenezer Byrd, Jerry J. Spraulding, and Gregory A. Jean-Baptiste in connection with a 2009 murder. During voir dire of the jury, the trial judge asked a series of open-ended questions, one of which inquired into the "type of work" the jurors did. Juror No. 8 answered that she was "an operating room nurse at a medical center." She did not state the name of the center. Defendants' trial began in January 2019.

In February 2019, Byrd's defense counsel's secretary emailed the trial judge's secretary about a call received by the Office of the Public Defender indicating that a juror "has been googling and texting [Byrd] and all of his friends." After calling the Office to gather more information, the judge's secretary sent the following email to the judge's court clerk: "[Employee S.] at the PD's office took the call. The woman identified herself as 'Miss Wurty(?)' but said she doesn't want to be involved any further. She claims she has a friend who works at Monmouth Medical Center with [A.B.] (I believe she is juror 15). She said [A.B.] has been googling the case, showing articles to and talking about it with other people, and has already decided she is going to find them all guilty and going to 'burn their asses.'"

The judge informed counsel that he intended to call the named juror up to question her. After deducing that the allegations pertained to Juror No. 8, the judge called her to sidebar and questioned her in the presence of defense counsel. He asked where she works (Monmouth Medical Center); whether, "in terms of any posting or newspaper articles, is there anything outside of what's been in this courtroom that you have been in contact with?" (no); and general questions about whether her responses to the questions asked during voir dire had changed, including her ability to listen to the evidence and "render a fair and impartial verdict" (no).

1

Defense counsel objected to the line of questioning and requested additional relief. Ultimately, the judge declined to inquire further. Defense counsel renewed their objections once the court excused the jury for the day, asking the judge to excuse Juror No. 8 for cause. The judge denied the request. The trial continued, and the jury convicted defendants on all counts.

On appeal, Byrd's counsel moved for a limited remand to reconstruct the record regarding Juror No. 8's alleged misconduct. The Appellate Division ordered a remand hearing. On remand, the trial judge described what prompted the inquiry into Juror No. 8, marking his notes and a series of emails between court staff as an exhibit for purposes of the remand hearing. Following the limited remand, defendants appealed their convictions and sentences on several grounds. The Appellate Division affirmed, holding, as relevant here, that the trial judge's response to allegations of Juror No. 8's misconduct did not constitute an abuse of discretion. The Court granted certification limited to the adequacy of the court's response to the allegations of misconduct by Juror No. 8. 258 N.J. 456 (2024); 258 N.J. 457 (2024); 258 N.J. 477 (2024).

**HELD:** The trial judge's inquiry into the allegations in this case was inadequate. When allegations of juror misconduct arise during trial, the court must assess their plausibility. Once the court is satisfied that the allegations are sufficiently plausible to require questioning, the court is obligated to conduct a specific and probing examination of the juror to determine whether misconduct occurred. Here, the trial judge determined the allegations required an inquiry of the juror but then failed to ask questions that directly addressed the allegations.

1. The constitutional right to trial by an impartial jury includes the expectation that the jury will decide the case solely on the evidence presented at trial, without influence of extraneous matters. When the trial court becomes aware of allegations of juror misconduct, bias, or external influence, it must determine, first, whether the allegations are sufficiently plausible to warrant further inquiry. If so, then the court must assess whether any affected jurors are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court. See State v. R.D., 169 N.J. 551 (2001). Trial courts must pose searching questions to uncover the specific nature of the extraneous information and safeguard the jury's impartiality. That inquiry should capture whether the juror -- intentionally or inadvertently -- shared any of the information with fellow jurors. Based on the juror's responses, the court must then determine whether individual voir dire of the rest of the jury is necessary to ensure continued impartiality. Any such determination should be placed on the record to facilitate appellate review. Still, the decision to voir dire additional jurors remains within the sound discretion of the trial judge, and no per se rule governs that determination. (pp. 17-20)

2

2.  Here, the trial judge's initial assessment of the allegations caused the court sufficient concern to take action by questioning Juror No. 8.  The fact that the caller accurately identified Juror No. 8 as an employee of the Monmouth Medical Center -- information not available to the parties or counsel at that point in the trial -- and provided her name and phone number and was therefore not "anonymous," supports the trial court's implicit determination that action was needed.  By way of guidance, the Court notes that courts should make such findings on the record.  (pp. 20-21)

3.  As explained in R.D., once the trial court determines that voir dire is necessary based on the nature of the alleged outside influence, it must engage in a scrupulous investigation into the situation, with deliberate questions designed to uncover potential prejudice in order to preserve the overall fairness of the proceedings.  See 169 N.J. at 560-63.  Here, the trial court failed to meet that standard both by questioning Juror No. 8 at sidebar in the presence of the jury and by failing to conduct a sufficient inquiry into the allegation that a seated juror was exposed to or engaged in prejudicial extraneous conduct.  When a trial court conducts an inquiry into potential jury misconduct by voir dire of a single juror, it must do so in open court and outside the presence of the remaining jurors.  This procedure serves two essential purposes.  First, it ensures transparency and allows both parties to participate meaningfully, thereby preserving the defendant's right to due process.  Second, and equally important, it protects the integrity of the jury as a deliberative body by minimizing the risk that other jurors will be influenced -- consciously or unconsciously -- by either the allegations or the inquiry itself.  (pp. 21-24)

4.  In regard to the scope of questioning, the court's questioning fell short of the standard set forth in R.D., 169 N.J. at 560, 563.  The Court reviews the questioning and notes that no question addressed whether Juror No. 8 had conducted internet research and that, more broadly, the court's inquiry centered on whether Juror No. 8 had received outside information but did not explore whether she had sought it out, discussed the case with others, or engaged in any conduct that might suggest a lack of impartiality.  Further, for the court's final question, the proper inquiry is not whether the juror believes herself to be impartial, but whether the trial court can satisfy itself as to the integrity of the proceedings by an objective determination of impartiality based on the juror's answers to probing, fact-specific questions.  The court's reliance on Juror No. 8's prior voir dire responses as a substitute for a fresh, probing examination of impartiality was inadequate under the circumstances.  The Court does not prescribe a rigid script for trial courts.  But questions in this context must be tailored to the specific allegations, clear in scope, and designed to provide jurors with an opportunity to disclose any breach of their obligation.  Here, the trial court's inquiry into Juror No. 8's alleged misconduct was insufficiently tailored to the allegations against the juror, failed to probe into the heart of the allegations, and was therefore inadequate.  (pp. 24-27)

5.  The trial court's incomplete inquiry also left unresolved the second step of the process described in R.D.:  a determination whether Juror No. 8 improperly influenced or shared prejudicial information with her fellow jurors.  (p. 28)

6.  The Court has previously held that, in extraordinary circumstances, post-trial juror questioning may be warranted.  The Court finds that such protection is necessary here and so remands the matter for an evidentiary hearing, including individual voir dire of the juror who allegedly engaged in misconduct, to determine whether juror taint occurred and, if so, whether further steps, including a new trial, are necessary.  (pp. 28-29)

**REVERSED and REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.**

SUPREME COURT OF NEW JERSEY

A-3/4/5 September Term 2024

089469

State of New Jersey,

Plaintiff-Respondent,

v.

Ebenezer Byrd, a/k/a
Ebernezer Byrd,
E.B. Byrd,
Ebenezer Bird,
Donali Byrd, and
Danall Johnson,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

Jerry J. Spraulding,
a/k/a Gerry Spraulding,
Jerry Spraulding,
Gerald J. Spraulding,
Jerry Batter,
Michael Harris,
Mark Love, and
Gerald Spaulding,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

Gregory A.
Jean-Baptiste, a/k/a
Gregory Jean Baptist,
Gregory Baptite,
and Gu Jean,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| February 3, 2025 | July 24, 2025 |

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant Ebenezer Byrd (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the briefs).

Andrew R. Burroughs, Designated Counsel, argued the cause for appellant Gregory A. Jean-Baptiste (Jennifer N. Sellitti, Public Defender, attorney; Andrew R. Burroughs, on the briefs).

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant Jerry J. Spraulding (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Melinda A. Harrigan, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Melinda A. Harrigan, of

counsel and on the briefs, and Monica do Outeiro, Assistant Prosecutor, on the briefs).

David M. Galemba, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; David M. Galemba, of counsel and on the brief).

Jonathan Romberg submitted a brief on behalf of amicus curiae Seton Hall University School of Law Center for Social Justice (Seton Hall University School of Law Center for Social Justice, attorneys; Jonathan Romberg, of counsel and on the brief).

JUSTICE NORIEGA delivered the opinion of the Court.

This appeal requires us to decide whether a trial judge took appropriate steps in response to serious mid-trial allegations of juror misconduct. The claims included that the juror conducted outside research, discussed the case with third parties, texted one of the defendants, and expressed an intent to find the defendants guilty.

We hold that the trial judge's inquiry into those allegations was inadequate. When allegations of juror misconduct arise during trial, the court must assess their plausibility. Once the court is satisfied that the allegations are sufficiently plausible to require questioning, the court is obligated to conduct a specific and probing examination of the juror to determine whether misconduct occurred. Here, the trial judge determined the allegations required

3

an inquiry of the juror but then failed to ask questions that directly addressed the allegations. Accordingly, we reverse the Appellate Division's judgment, and remand to the trial court for an evidentiary hearing to evaluate the allegations of juror misconduct.

I.

A.

The State charged defendants Ebenezer Byrd, Jerry J. Spraulding, and Gregory A. Jean-Baptiste in connection with the 2009 murder of Jonelle Melton, a Red Bank Middle School teacher. According to the State, defendants mistakenly entered the victim's apartment instead of the apartment of their intended target, where they planned to commit a burglary. The encounter led to the victim's brutal beating and fatal shooting. The prosecution charged the defendants with multiple offenses, including first-degree felony murder, first-degree armed robbery, second-degree conspiracy to commit armed burglary, second-degree burglary, and weapons-related charges. The prosecution also charged Byrd and Jean-Baptiste with first-degree witness tampering charges, while Byrd faced an additional count of third-degree witness tampering.

Jury selection for defendants' joint trial began on January 8, 2019. On January 15, 2019, the trial judge asked the jurors a series of open-ended

4

questions, one of which inquired into the "type of work" the jurors did. Juror No. 8 answered that she was "an operating room nurse at a medical center." She did not state where that medical center was located or the name of the center. A review of the transcript from jury selection reveals that Juror No. 8 never mentioned that she worked at the Monmouth Medical Center, a fact that we discuss further below.[1] The jury information sheet submitted to the parties included an entry for Juror No. 8 with her name, occupation, and town of residence. Her occupation was listed as "administrator."

Defendants' trial began on January 17, 2019. On February 19, 2019, Byrd's defense counsel's secretary emailed the trial judge's secretary, writing:

> I received a call from the Public Defender's Office a few minutes ago. They received a call from an unidentified woman who told them she had information on one of the jurors. She knows the juror's name but did not disclose it and said she would call back. Apparently, this woman has been googling and texting [Byrd] and all of his friends. [Employee S.] from the PD's office is the one to speak to as she received the call.

---

[1] The only written indication concerning a connection between Monmouth Medical Center and Juror No. 8 was provided to this Court after oral argument by the State, in the form of its internal juror note sheet, which had a handwritten notation stating, "Nurse - Mon - Med." It is unclear when, during the trial or thereafter, this notation was made. As addressed below, the only time Juror No. 8 stated her place of work on the record was during the side bar conversation with the trial judge that is the subject of this appeal.

The judge's secretary called the Office of the Public Defender to gather more information. The secretary then sent the following email to the judge's court clerk:

> [Employee S.] at the PD's office took the call. The woman identified herself as "Miss Wurty(?)"[2] but said she doesn't want to be involved any further. She claims she has a friend who works at Monmouth Medical Center with [A.B.][3] (I believe she is juror 15). She said [A.B.] has been googling the case, showing articles to and talking about it with other people, and has already decided she is going to find them all guilty and going to "burn their asses."

The judge learned about the allegations and informed counsel that he intended to call the named juror up to "question her, see whether or not the answers to any of her initial jury questions have changed, and . . . to find out where she works." The judge and defense counsel deduced the allegations pertained to Juror No. 8, not Juror No. 15. Defense counsel for Byrd requested that the judge find out where the juror lived, voir dire the juror in his chambers, and voir dire the entire jury no matter what the juror said. Counsel for Spraulding asked the judge to inquire about some of the specific allegations, especially the claim "that she talked to other jurors." The judge

---

[2] The transcript of the remand hearing spells the caller's name as "Ms. Worthy." We use this spelling going forward.

[3] The caller used the juror's full name. We use fictitious initials to preserve the juror's confidentiality.

replied: "I will ask whether or not she did, but the fine line that I want to try to stay on is I don't want anything specific to any of your individual clients."

The judge called Juror No. 8 to sidebar and questioned her in the presence of defense counsel as follows:

> [JUDGE]: At the beginning of this process we asked you a series of questions and those questions were designed to find out whether or not you could be fair and impartial. Is there anything that has happened throughout the course of this trial that would affect your answers to those questions?
>
> [JUROR No. 8]: No.
>
> [JUDGE]: Ma'am, where do you work?
>
> [JUROR No. 8]: At Monmouth Medical.
>
> [JUDGE]: Where do you live?
>
> [JUROR No. 8]: In Red Bank.
>
> [JUDGE]: Okay. And in terms of any posting or newspaper articles, is there anything outside of what's been in this courtroom that you have been in contact with?
>
> [JUROR No. 8]: No.
>
> [JUDGE]: So is there anything that would change any of your other answers to those questions that we asked during voir dire?
>
> [JUROR No. 8]: No.
>
> [JUDGE]: And you believe that you can listen to the evidence in this case, and as I have asked you certainly

7

throughout the voir dire process, listen to the evidence, apply the law as I give it to you at the end of the case and render a fair and impartial verdict?

[JUROR No. 8]: I can.

[JUDGE]: Okay.

[JUROR No. 8]: Why do you ask?

[JUDGE]: Because that's my job.

[JUROR No. 8]: Okay.

[JUDGE]: I ask the questions. You don't. What I want you to do is I want you to take your seat. This is a discussion, a private discussion, up at sidebar, the same as we did for jury selection.

[JUROR No. 8]: Okay.

[JUDGE]: I did that for a reason. I don't want you to discuss anything that we have talked about up here as we move forward. Okay?

[JUROR No. 8]: Okay.

[JUDGE]: You may be seated. Thank you.

The judge then spoke with defense counsel, who all objected to the line of questioning and requested additional relief. Counsel for Byrd objected because the court did not inquire whether Juror No. 8 had discussed the matter at work. The judge responded to the objection by stating:

[JUDGE]: I specifically asked her whether or not she had any outside information, anything outside of this courtroom. She said no, and I think the record should

reflect that clearly she was puzzled why she would even be up here answering these questions. In this Judge's opinion, she seemed very sincere and she seemed very straightforward with her answers. So in terms of further inquiry, I'm satisfied at this point.

Counsel for Spraulding asked that the judge dismiss Juror No. 8, arguing that her being singled out was itself cause for dismissal. And counsel for Jean-Baptiste asked that she be questioned further and specifically about whether she had spoken to anyone at work. Ultimately, the judge declined to inquire further:

[JUDGE]: Okay. I'm satisfied at this point with the inquiry that I have made. My concern is to make sure that we have a fair and impartial trial with fair and impartial jurors. I specifically asked her whether or not she has come into contact with any outside information. Her answer was no. And, as I indicated, she was about as candid and as straightforward as she could be; and while I do hear you, [counsel for Spraulding], but with regard to your concerns, I specifically told her not to discuss anything that we discussed here at sidebar, so I'm satisfied at this point that we can move forward. This was an outside concern that was given originally to the Public Defender's Office, then brought to our attention. The person, as I understand the information to the Public Defender's Office, originally had indicated it was a different juror and then changed to Juror No. 8 and the information as I understood it had originally started out that this juror was texting Ebenezer Byrd and her friends and clearly -- and his friends and clearly that couldn't happen because Mr. Byrd has been in custody for quite some time at this point without access to computers or texting or Facebook or any of those other things, so I'm satisfied at this point we can proceed.

9

Defense counsel renewed their objections once the court excused the jury for the day, asking the judge to excuse Juror No. 8 for cause. The State objected to defense counsel's request. The judge responded to defense counsel that he had been watching the jurors during trial and that "they certainly seem[ed] intent" and "focused." He emphasized that Juror No. 8's demeanor "was very candid" and "straightforward when she answered the questions." He explained that if Juror No. 8 was exhibiting any distress, it was because

> speaking with a Superior Court judge is stressful enough, so to the extent there was stress beyond that, I did not notice that or pick up on that. So having said that, I'm comfortable at this point, we have explored the issue. I was satisfied with her answers about her ability to be fair and impartial, and that the answer that she gave us throughout the course of what was a lengthy voir dire to select these jurors for this case had indicated that her answers have not changed. So with that, I'm satisfied at this point and I will deny that request.

The trial continued, and the jury convicted defendants on all counts. Defendants were ultimately sentenced to life in prison. The court also sentenced Byrd to two consecutive twenty-year terms for two counts of first-degree witness tampering and a consecutive five-year term for third-degree witness tampering and Jean-Baptiste to a consecutive twenty-year term for first-degree witness tampering.

10

## B.

On appeal, Byrd's counsel moved for a limited remand to reconstruct the record regarding Juror No. 8's alleged misconduct. The Appellate Division ordered a remand hearing to confirm the nature of the allegations against Juror No. 8.[4] On remand, the trial judge described what prompted the inquiry into Juror No. 8, marking his notes and a series of emails between court staff as an exhibit for purposes of the remand hearing. He explained:

> So clearly . . . there [was] some outside Googling and . . . an allegation that there was a pre-determination by one of the [jurors] . . . [and] that was the nature of the inquiry and the reason why the Court proceeded the way the Court did.
>
> Clearly, I did not want to taint the rest of the jury with regards to something that may certainly have been all fabricated. We may never know who Ms. Worthy is. She was never part of this trial, never listed, as I understand it, on any of the witness lists, that name is foreign to me, had not heard it prior to haven't heard it hence. And with that, I chose the course that I chose to question . . . only the individual juror.
>
> . . . .
>
> [W]hether . . . she should have been called into my chambers . . . throughout the course of my career I have never done and certainly did not want to start it with this case.

---

[4] The appellate court also ordered the judge to confirm whether the allegations involved a claim of racial bias; the judge dispelled that concern on remand.

11

. . . .

> [J]uror number 8 was clear and unequivocal. She seemed . . . puzzled as to why she was there . . . [and] made it clear to this Court that she could be fair and impartial, and that she could listen to the testimony and apply the law as I gave it to her at the end of the case.

> . . . .

> The allegation simply was that she had been texting and talking about the case, and I was satisfied based on her candid response to my questions that that had not happened.

Following the limited remand, defendants appealed their convictions and sentences on several grounds, and the Appellate Division affirmed. Relevant to this appeal, the Appellate Division held that the trial judge's response to the allegations of Juror No. 8's misconduct did not constitute an abuse of discretion.

The Appellate Division relied on State v. R.D., 169 N.J. 551 (2001), and State v. Loftin, 191 N.J. 172 (2007), in reaching its conclusion, reasoning that "the judge confirmed Juror No. 8 was able to 'listen to the evidence,' 'apply the law' as instructed[,] . . . and 'render a fair and impartial verdict.'" The appellate court determined that the judge objectively evaluated the juror's impartiality instead of relying on the juror's own subjective evaluation and was "understandably skeptical about the allegations" based on their source and

contents.  For example, the court noted, the caller originally claimed that a juror was texting Byrd, which the trial judge reasoned "couldn't happen because Mr. Byrd ha[d] been in custody for quite some time."  Relying on out-of-state case law as well, the Appellate Division suggested that "less credible allegations of juror misconduct necessitate a less extensive inquiry."  (citing United States v. Zimny, 846 F.3d 458, 470 (1st Cir. 2017); State v. Brown, 668 A.2d 1288, 1305 (Conn. 1995)).

Here, the Appellate Division highlighted that the allegations did not identify the caller or the juror's co-workers; the allegations of misconduct were "seemingly conflicting" as to whether Juror No. 8 was aligned with or against the defendants; the trial involved witness tampering charges; and the only accurate information conveyed was the juror's name and place of work -- which could be gleaned by the public during voir dire.  The Appellate Division therefore concluded that the judge properly exercised his discretion by "weighing the relevant factors" and choosing not to "delve further into non-credible allegations."

We granted certification, limited to the question of whether the trial court's response to allegations of misconduct by Juror No. 8 was adequate. 258 N.J. 456 (2024); 258 N.J. 457 (2024); 258 N.J. 477 (2024).  We then granted motions to appear as amici curiae from the Seton Hall University

13

School of Law Center for Social Justice (CSJ) and the Attorney General of New Jersey.

## II.

Defendants ask us to reverse and remand for a new trial. They contend that the judge failed to voir dire Juror No. 8 specifically and thoroughly, as required under New Jersey case law. Spraulding and Byrd argue that if an allegation of juror taint has the capacity to prejudice the defense, then the judge must conduct a specific, probing voir dire of the juror and jury; failure to do so requires reversal. Spraulding contends the allegations here were facially plausible, and the judge therefore was required to administer a thorough voir dire. He compares the judge's specific questions in <u>R.D.</u> to the "vague" and "close-ended" questions asked here. Byrd adds that the judge's "vague" and "cursory" questioning did not address "the most serious" allegation: Juror No. 8's predetermination of the case.

All three defendants contend that the judge erred by failing to voir dire the other jurors to determine whether any alleged misconduct had affected the rest of the jury. Byrd and Jean-Baptiste argue that the voir dire in this case should not have been done at sidebar in the full view of the entire jury, an issue that Spraulding raised for the first time at oral argument and now joins. They also suggest the voir dire should have been conducted in camera.

14

The CSJ asks us to reverse and remand for a new trial, arguing that the trial judge failed to conduct the required probing and thorough inquiry into the specific allegations about Juror No. 8. The CSJ adds that a trial judge must conduct a detailed and specific inquiry to determine any potential capacity to affect the jury's verdict when the court learns of a realistic possibility that a juror may have been exposed to evidence outside the courtroom or may have prejudged guilt.

The State asks us to affirm the Appellate Division. It argues that the trial judge's questioning was adequate because the allegation of juror taint was not, on its face, independently accurate. The allegations, the State says, were based on triple hearsay and contained information that could be gleaned from anyone in the courtroom during jury selection. The State argues that the trial judge's questions sufficiently covered the allegations, that Juror No. 8's answers were clear and unequivocal that she was not in contact with any outside information and that she could be fair and impartial, and that asking Juror No. 8 or the other jurors about the specific allegations would promote prejudice rather than prevent it.

The State also argues that pursuant to R.D., there was no need for the court to expand its inquiry to other jurors in the case because the judge found that Juror No. 8 was not tainted. It challenges defendants' assertions of

15

wholesale jury taint, emphasizing that the jury never complained about Juror No. 8, deliberated for two days, and played back three hundred pages of trial transcript.

The Attorney General asks us to affirm, contending that the trial judge properly exercised his discretion because the juror credibly confirmed she could be fair and impartial and the phone tip lacked indicia of reliability. The Attorney General emphasizes that it is within a judge's discretion to determine the level of inquiry necessary based on case-specific circumstances and also cautions that requiring judges to confront jurors with excessive questioning, regardless of the veracity of the allegation, will have adverse consequences.

### III.

### A.

This Court reviews a trial court's determination of juror influence or misconduct for abuse of discretion. R.D., 169 N.J. at 559-60. A reviewing court gives deference to the trial judge's factual findings regarding jurors, "which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Wakefield, 190 N.J. 397, 495 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).

16

B.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to trial by an impartial jury. That right includes the expectation that the jury will decide the case solely on the evidence presented at trial, without influence of extraneous matters. See Sheppard v. Maxwell, 384 U.S. 333, 362-63 (1966); State v. Williams, 93 N.J. 39, 60 (1983); State v. Bey, 112 N.J. 45, 75 (1988); R.D., 169 N.J. at 559.

The trial judge bears the primary responsibility for safeguarding that constitutional guarantee. That duty includes evaluating prejudicial occurrences as well as their impact when they arise. See Smith v. Phillips, 455 U.S. 209, 217 (1982). To that end, trial judges must "'take all appropriate measures to ensure the fair and proper administration of a criminal trial,' including 'preserv[ing] the jury's impartiality throughout the trial process.'" State v. Tyler, 176 N.J. 171, 181 (2003) (alteration in original) (quoting Williams, 93 N.J. at 62). Trial judges must "protect both the jurors and their deliberations from illegitimate influences that threaten to taint the verdict." R.D., 169 N.J. at 557 (quoting Bey, 112 N.J. at 75).

When an outside influence threatens the fairness of the trial, the court has an independent obligation to respond swiftly and decisively. See id. at

17

557-58; <u>Bey</u>, 112 N.J. at 83-84; <u>Williams</u>, 93 N.J. at 63. The test for determining when action is appropriate "is not whether the irregular matter actually influenced the result but whether it had the capacity of doing so." <u>Panko v. Flintkote Co.</u>, 7 N.J. 55, 61 (1951).

When the trial court becomes aware of allegations of juror misconduct, bias, or external influence, it must determine, first, whether the allegations are sufficiently plausible to warrant further inquiry. If so, then the court must assess whether any affected jurors "are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner, based strictly on the evidence presented in court." <u>R.D.</u>, 169 N.J. at 558 (quoting <u>Bey</u>, 112 N.J. at 87); <u>see</u> <u>United States v. Mikutowicz</u>, 365 F.3d 65, 74 (1st Cir. 2004) (establishing that the court must first determine whether an allegation of juror misconduct is "colorable," and then, if so, "conduct a further investigation to discern the extent of the jury taint and the possible prejudice" (first citing <u>United States v. Boylan</u>, 898 F.2d 230, 258 (1st Cir. 1990); and then citing <u>United States v. Cruz</u>, 156 F.3d 22, 28 (1st Cir. 1998))).

In <u>R.D.</u>, this Court emphasized that "the trial court is in the best position to determine whether the jury has been tainted." 169 N.J. at 559. When considering possible juror taint, trial courts are to evaluate several factors, including the seriousness of the extraneous information in relation to the issues

18

at trial; the demeanor and credibility of any juror exposed to the information; and the potential impact on the fairness of the proceedings. Ibid. The court does so by first "interrogat[ing] the juror, in the presence of counsel, to determine if there is a taint," and second, if the judge discerns taint, "the inquiry must expand to determine whether any other jurors have been tainted thereby." Ibid. After surveying the jury, "[t]he trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary." Ibid.

As we have explained, "[t]he procedure of questioning an impaneled jury when [extraneous information] threatens the fairness and integrity of a defendant's trial should not be invoked begrudgingly." Bey, 112 N.J. at 89. The purpose of the process is to uncover potential prejudice to constitutional rights -- and to do so at a time when corrective measures are still available, before ordering a new trial is the only remedy. Ibid.

Trial courts must pose "searching" and "probing questions" to uncover the specific nature of the extraneous information and safeguard the jury's impartiality. R.D., 169 N.J. at 560, 563. That inquiry should capture whether the juror -- intentionally or inadvertently -- shared any of the information with fellow jurors. Id. at 560. Based on the juror's responses, the trial court must then determine whether individual voir dire of the rest of the jury is necessary

19

to ensure continued impartiality.  Ibid.  Any such determination should be placed on the record to facilitate appellate review under the abuse of discretion standard.  Id. at 560-61.  Still, the decision to voir dire additional jurors remains within the sound discretion of the trial judge, and no per se rule governs that determination.  Id. at 561.

IV.

Applying those principles here, we first address the judge's decision to voir dire the allegedly tainted juror.  We next consider whether the court's investigation under the two-part test set forth in R.D. was sufficient as to Juror No. 8 and as to the remaining jurors.  Finally, we determine the appropriate remedy.

A.

We begin by highlighting that the trial judge's initial assessment of the allegations caused the court sufficient concern to take action.  The trial judge did not make an explicit finding about the plausibility of the allegations in this case.  Nevertheless, we can infer from the court's decision to question the juror -- in support of which the court explained that "there [was an allegation of] some outside Googling and . . . an allegation that there was a pre-determination by one of the [jurors]" -- that the court found the alleged misconduct sufficiently plausible to warrant inquiry.

20

We do not question that decision. Indeed, the caller accurately identified Juror No. 8 as an employee of the Monmouth Medical Center -- information that was apparently not available to the parties or counsel at that point in the trial. That detail lent credibility to the allegation and supported the court's determination to proceed with an inquiry.

The Attorney General appears to challenge the trial court's determination that action was warranted by repeatedly describing the caller as "anonymous" and the information provided as lacking indicia of reliability. We note, however, that the caller provided her name and phone number, which was at least initially available to the Office of the Public Defender. Although no further investigation into the caller's identity was conducted by any party, the record does not support the use of the term "anonymous" under these circumstances. In short, we find no reason to question the trial court's implicit determination that action was needed in this case. By way of guidance, we note that courts should make such findings, on the record, as an initial step in considering allegations of juror misconduct.

We turn, therefore, to the adequacy of the court's voir dire.

B.

As we explained in R.D., once the trial court determines that voir dire is necessary based on the nature of the alleged outside influence, it must engage

21

in a scrupulous investigation into the situation, with deliberate questions designed to uncover potential prejudice in order to preserve the overall fairness of the proceedings. See 169 N.J. at 560-63. Here, we find that the trial court failed to meet that standard both by questioning Juror No. 8 at sidebar in the presence of the jury and by failing to conduct a sufficient inquiry into the allegation that a seated juror was exposed to or engaged in prejudicial extraneous conduct.

1.

R.D.'s mandate to "interrogate the juror, in the presence of counsel," is not a mere procedural formality, but is instead rooted in the need for fairness and for a clear record of the inquiry and its scope. Id. at 558. The presence of counsel allows for appropriate follow-up questions and objections, and prevents later claims of incomplete or biased examination.

When a trial court conducts an inquiry into potential jury misconduct by voir dire of a single juror, it must do so in open court and outside the presence of the remaining jurors. This procedure serves two essential purposes. First, it ensures transparency and allows both parties to participate meaningfully, thereby preserving the defendant's right to due process. Second, and equally important, it protects the integrity of the jury as a deliberative body by

22

minimizing the risk that other jurors will be influenced -- consciously or unconsciously -- by either the allegations or the inquiry itself.

Equally, the exclusion of other jurors' presence during the inquiry serves to contain possible taint. If other jurors remain in the courtroom while one is being questioned about possible misconduct or bias, the inquiry itself may inject improper considerations into the deliberations. This is the harm that courts are seeking to avoid. Voir dire conducted outside the presence of the full panel minimizes such a risk and protects the remaining jurors from exposure to potentially prejudicial information. See Bey, 112 N.J. at 89-90 (noting that voir dire of individual jurors is a prophylactic measure designed to preserve the impartiality of the jury and protect the integrity of the verdict).

This practice aligns with the broader principle that when a juror's impartiality is called into question, the process for evaluating that claim must be both thorough and shielded from further risk of contamination.[5]

---

[5] The trial judge remarked during the remand hearing that despite defense counsel's request to do so, he had never brought a juror into chambers for an in-camera discussion throughout his entire career. But an in-camera discussion is not the alternative contemplated by case law to an interrogation at sidebar while the remainder of the jury was present. Rather, the juror at issue should have been questioned individually in open court, with counsel present, and outside the presence of the remaining jurors. That limited and routine step is consistent with long-standing practice and serves to preserve the impartiality of the jury and the integrity of the trial process. See R.D., 169 N.J. at 560-61; Bey, 112 N.J. at 89-90.

Conducting the inquiry in open court -- with only the questioned juror, the judge, and counsel present -- ensures both transparency and containment.

2.

In regard to the scope of questioning, we reiterate that the trial court is obligated to conduct a probing and independent inquiry once there is a plausible suggestion of juror taint. See R.D., 169 N.J. at 560, 563. Here, the court's questioning fell short of that standard.

The allegation itself suggested alarming conduct by a juror: a call reporting that a sitting juror had prejudged the case, spoken to co-workers about the details, "Googled" the case, texted one of the defendants, and stated to co-workers that she intended to "burn their asses."

It is undisputed that the information regarding Juror No. 8 arrived through multiple intermediaries before reaching the trial judge, and that certain details -- such as whether the juror was able to text an in-custody defendant -- were conflicting or unclear. Nonetheless, the trial judge found the allegations plausible enough to warrant questioning the juror at sidebar. Once the judge committed to conducting an inquiry, any speculation regarding perceived discrepancies could not justify a cursory examination.

The trial judge's questioning fell short in several key respects. Among the allegations presented was that Juror No. 8 had been "Googling" the case.

24

During the sidebar inquiry, the court asked: "And in terms of any posting or newspaper articles, is there anything outside of what's been in this courtroom that you have been in contact with?" That question, by its phrasing, narrowly focused on exposure to passive media sources -- "posting[s] or newspaper articles" -- and failed to ask the more direct and necessary question: whether the juror herself had actively conducted any internet research about the case.

More broadly, the court's inquiry centered on whether Juror No. 8 had received outside information, but did not explore whether she had sought it out, discussed the case with others, or engaged in any conduct that might suggest a lack of impartiality.

The court's last question also failed to address the core allegation of pre-determination. The court asked: "And you believe that you can listen to the evidence in this case, and as I have asked you certainly throughout the voir dire process, listen to the evidence, apply the law as I give it to you at the end of the case and render a fair and impartial verdict?" While this question reaffirms the juror's understanding of her duty to remain impartial, it does not reach the critical issue of whether the juror engaged in conduct inconsistent with that duty. The proper inquiry is not whether the juror believes herself to be impartial, but whether the trial court can satisfy itself as to the integrity of the proceedings by an objective determination of impartiality based on the

25

juror's answers to probing, fact-specific questions.  See State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997).

The court's reliance on Juror No. 8's prior voir dire responses as a substitute for a fresh, probing examination of impartiality was inadequate under the circumstances.  Similarly, referencing general instructions given to the venire at the outset of trial, without context or connection to the specific allegation, does not meaningfully test whether the juror remained impartial after being exposed to potentially prejudicial information.  Vague references to general voir dire instructions will rarely suffice in uncovering prejudicial conduct when juror taint is alleged.

To be clear, we do not prescribe a rigid script for trial courts; indeed, this opinion is not a road map for what may or may not be asked.  But questions in this context must be tailored to the specific allegations, clear in scope, and designed to provide jurors with an opportunity to disclose any breach of their obligation.  Here, the trial court was not required to accuse the juror of misconduct to adequately investigate the allegation.  The court could have asked straightforward, neutral questions that were both non-prejudicial and responsive to the concerns raised.  For example:  "Have you talked about this case at work?"  "Have you expressed an opinion about the case to others?"  "Have you spoken to anyone at Monmouth Medical Center about it?"  Such

26

questions are tethered to the court's own jury instructions and would have provided an opportunity for the juror to disclose information material to her impartiality.

Fundamentally, trial judges retain broad discretion in determining whether allegations of juror misconduct are sufficiently plausible to warrant inquiry, in shaping the scope of that inquiry, and in evaluating the credibility of the responses given. However, once the court finds the allegations sufficiently plausible to question the juror, that discretion to ask is not discharged by conducting a superficial or incomplete examination. At that point, the court must undertake a focused and probing inquiry.

This is not an onerous burden. As this Court has previously explained, voir dire of potentially tainted jurors is a minimal and prophylactic procedure -- particularly when conducted mid-trial, before deliberations begin or a verdict is rendered. Bey, 112 N.J. at 89-90. This is why courts maintain alternate jurors: to preserve the integrity of the process when a seated juror's impartiality is in doubt.

For these reasons, we hold that the trial court's inquiry into Juror No. 8's alleged misconduct was insufficiently tailored to the allegations against the juror, failed to probe into the heart of the allegations, and was therefore inadequate.

27

## C.

The trial court's incomplete inquiry also left unresolved the second step of the process described in R.D.: a determination whether Juror No. 8 improperly influenced or shared prejudicial information with her fellow jurors. That uncertainty strikes at the heart of the defendants' constitutional right to an impartial jury. As this Court has emphasized, the question is not whether outside influence did affect the verdict, but whether it had the capacity to do so. R.D., 169 N.J. at 559. Because the trial court failed to engage in a thorough investigation once plausible allegations arose, the integrity of the deliberative process cannot be assured on this record.

## D.

This Court has previously held that, in extraordinary circumstances, post-trial juror questioning may be warranted, "only upon a strong showing that a litigant may have been harmed by jury misconduct." State v. Koedatich, 112 N.J. 225, 288 (1988) (quoting State v. Athorn, 46 N.J. 247, 250 (1966)). That remedy, though rare, is recognized to protect the integrity of the deliberative process while preserving confidence in the finality of jury verdicts. State v. Harris, 156 N.J. 122, 154 (1998).

We find that such protection is necessary here, and we therefore remand the matter for an evidentiary hearing, including individual voir dire of the juror

28

who allegedly engaged in misconduct, to determine whether juror taint occurred and, if so, whether further steps, including a new trial, are necessary.

## V.

The judgment of the Appellate Division upholding the trial judge's questioning is reversed. We remand for further proceedings in the trial court consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.

29